IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| THELMA HURD, M.D. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| UNIVERSITY HEALTH SCIENCE | § | SA09CA0645 |
| CENTER SAN ANTONIO, and | § | |
| STEPHEN COHN, MORTON | § | |
| KAHLENBERG, RONALD STEWART, | § | |
| and WILLIAM HENRICH, Individually | § | |
| and in their Official Capacities. | § | |
| | § | |
| Defendants. | § | |



---

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

---

For her Original Complaint against the University of Texas Heath Science Center at San Antonio ("UTHSCSA" or "Defendant") and against Stephen Cohn, Morton Kahlenberg, Ronald Stewart, and William Henrich (in their official and individual capacities), Plaintiff Thelma Hurd, M.D. ("Hurd" or "Plaintiff") shows the following:

**Introduction**

1. Hurd is a nationally-recognized breast surgeon and tenured-faculty member in UTHSCSA's Department of Surgery. She is also African American. Hurd brings this action against Defendants under 42 U.S.C. Sections 1981 and 1983 to remedy race discrimination in the workplace as well as violations of her procedural and substantive due process rights. Hurd now sues for damages and equitable relief.

1

## Parties

2. Hurd is an individual residing in San Antonio, Bexar County, Texas. She may be served with papers in this case through the undersigned counsel.

3. The University of Texas Health Science Center-San Antonio is part of the University of Texas System. It may be served with process through its president, William Henrich.

4. Stephen Cohn is an individual residing in San Antonio, Bexar County, Texas. He is sued in his individual and official capacity and may be served with process at his place of work, The University of Texas Health Science Center-San Antonio, 7703 Floyd Curl, San Antonio, Texas 78229.

5. Morton Kahlenberg is an individual residing in San Antonio, Bexar County, Texas. He is sued in his individual and official capacity and may be served with process at 7703 Floyd Curl, San Antonio, Texas 78229.

6. Ronald Stewart is an individual residing in San Antonio, Bexar County, Texas. He is sued in his individual and official capacity and may be served with process at 7703 Floyd Curl, San Antonio, Texas 78229.

7. William Henrich is an individual residing in San Antonio, Bexar County, Texas. He is sued in his individual and official capacity and may be served with process at 7703 Floyd Curl, San Antonio, Texas 78229.

## Jurisdiction and Venue

8. The Court possesses subject matter jurisdiction under 28 U.S.C. Section 1331 because Hurd's claims arise under federal laws, 42 U.S.C. Section 1981, 42 U.S.C. Section 1983, and the Constitution of the United States of America.

9. The Court possesses personal jurisdiction over Defendants because UTHSCSA is an entity of the State of Texas and because the individual Defendants reside and work in the State of Texas.

10. Venue is proper in the San Antonio Division of the Western District of Texas because all of the events giving rise to Dr. Hurd's claims occurred in San Antonio, Texas.

**Factual Background**

11. Dr. Thelma Hurd is a well-known and widely-recognized expert in the field of breast cancer surgery. Dr. Hurd received her M.D. degree from the University of Medicine & Dentistry of New Jersey (UMDNJ) at Newark.

12. Dr. Hurd remained at UMDNJ for her internship and residency in general surgery as well as for a postdoctoral research fellowship in shock and sepsis. She also completed a clinical surgical oncology fellowship at Ohio State University. Dr. Hurd also completed a fellowship in tumor immunobiology, and she received additional training in health disparities at the U.T.M.D. Anderson Cancer Center in Houston.

13. From 1993 to 1997, Dr. Hurd served as a faculty member in the Surgical Oncology Section at the U.T. Southwestern Medical Center at Dallas. Dr. Hurd was then recruited to the Department of Breast Surgery at Roswell Park Cancer Institute, where she served from 1997 to 2005. She held a concurrent appointment at the State University of New York at Buffalo, and rose to the rank of associate professor.

14. Dr. Hurd was hired by UTHSCSA in 2004, and was appointed to the position of Associate Professor of Surgery (with tenure) and Director of the Breast Surgery Program.

15. By virtue of this tenured position, Dr. Hurd has a property interest in her job bestowed by Texas and federal law and the University of Texas Regents' Rules.

3

16. Dr. Hurd is also African American. Upon information and belief, Dr. Hurd is one of only two African American faculty members of the Department of Surgery, and she is the only African American to hold tenure in the Department.

17. Unfortunately, in early 2006, Dr. Hurd was diagnosed with multiple sclerosis in San Antonio, and she took a very brief medical leave of absence. Fortunately, in May 2006, it was later determined by experts at Columbia Presbyterian Hospital, New York, NY that Dr. Hurd did not suffer from multiple sclerosis, and her own physicians released her to return to work without restrictions.

18. While Dr. Hurd was on leave, however, her supervisors—Dr. Morton Kahlenberg and then-Surgery Department Chairman Dr. Steve Cohn commenced a highly-suspect internal investigation into her management of several breast cancer cases.

19. Dr. Kahlenberg and his cohorts quickly and erroneously "determined" that Dr. Hurd was not fit to practice medicine and surgery.

20. On April 7, 2006, Drs. Cohn and Kahlenberg met with Dr. Hurd and reassigned her to research pending "final resolution" of the investigation. (However, as explained below, Defendants would delay this process unfairly and not advise Dr. Hurd until November 2008 that this reassignment would be permanent.)

21. In violation of Dr. Hurd's due process rights and right to be free from discrimination on the basis of race and color, they and their successors--including current Surgery Department Chairman Dr. Ronald Stewart--have prohibited Dr. Hurd from seeing patients and performing surgery since that day.

22. Plaintiff has been unable to renew her privileges at the San Antonio area hospitals with whom she was previously affiliated due to non-resolution of this matter.

4

23. After taking the above mentioned actions, Defendant Kahlenberg sought an "independent" review by Dr. Scott Kurtzman of eighteen cases that Defendant Kahlenberg felt Dr. Hurd had mishandled.

24. Dr. Kurtzman's initial findings largely cleared Dr. Hurd.

25. After Kurtzman's initial findings, Dr. Kahlenberg traveled to Connecticut to meet with Dr. Kurtzman to share "additional" concerns and "clarify" certain matters. As a result of this improper ex parte communication, Dr. Kurtzman issued a second, supplemental report that changed his opinion as to six cases.

26. Because Dr. Kahlenberg's improper actions (a deviation from policy) tainted Dr. Kurtzman's review, UTHSCSA was essentially forced to find a second, external reviewer. The Dean of the Medical School at the time, Dr. William Henrich, who is now the President, ultimately found Dr. Nadar Hannah of the University of Maryland.

27. Dr. Hannah specializes in the treatment of gastrointestinal, and not breast cancers. In fact, Dr. Hannah's curriculum vitae indicates that he has no significant experience in breast cancer surgery.

28. Plaintiff contends that Dr. Hannah was not qualified to pass judgment on whether Dr. Hurd met the standard of care in any of the subject cases. Indeed, at a meeting in February 2008, Dr. Henrich advised Dr. Hurd that Dr. Hannah had agreed to conduct the review on the condition that he not be formally accountable for his findings and conclusions.

29. For seven months, Defendants refused to provide Dr. Hurd with the patient names, medical files, or the questions sent to either of the external reviewers so that she could mount a defense to the actions taken against her. Finally, after months of haggling and delay tactics, Plaintiff was provided the information she requested. To her dismay, Dr. Hurd realized

that neither Dr. Kurtzman nor Dr. Hannah had been provided with the complete patient files. Missing were various operative reports, pathology reports, breast imaging reports, progress notes, and other important documents.

30. On or about June 5, 2007, Dr. Hurd was advised that the Department of Surgery would be seeking to revoke her tenure and discharge her from employment.

31. In August 2007, Dr. Hurd learned for the first time that her salary would be substantially cut effective September 2007. Again, this constituted a violation of Dr. Hurd's rights to due process and right to work free from race and color discrimination.

32. In point of fact, Dr. Hurd did not in any way mishandle any of her cases and her treatment of patients has met the standard of care in all material respects.

33. Upon information and belief, non-African American physicians at the UTHSCSA and in the Department of Surgery in particular, have been accused of mishandling cases but have not suffered the same type of draconian penalty as Plaintiff.

34. None of these other physicians have been suspended from their clinical and surgical practice. Dr. Hurd has been singled out, and race has been a factor in her treatment.

35. In response, and facing the discriminatory and wrongful termination of her employment, Dr. Hurd sought an independent review by Drs. Charles Balch and Lisa Jacobs of Johns Hopkins School of Medicine. Dr. Balch, who was previously with M.D. Anderson in Houston, is a world-renowned expert in the field of breast cancer surgery. Dr. Jacobs is nationally-known in the specialty of breast cancer surgery. Drs. Balch and Jacobs were sent the complete patient files for review. After a thorough analysis, Drs. Balch and Jacobs exonerated Dr. Hurd. This report was promptly provided to Defendants.

36. Despite Dr. Balch's thorough analysis and report, Defendants refused to reinstate Dr. Hurd's privileges and persisted in its attempt to terminate her employment.

37. In February 2008, Dr. Henrich refused to grant Dr. Hurd a meaningful name clearing hearing on the matter in violation of the University of Texas Regents' Rules and Dr. Hurd's due process rights. Despite this lack of a meaningful hearing, and despite full knowledge that the UTHSCSA's external reviewers had not been provided the complete medical records, Dr. Henrich concurred in the Department of Surgery's recommendation to discharge Dr. Hurd from employment.

38. When Dr. Hurd elevated the matter to the office of Dr. Cigarroa, the then-President of the UTHSCSA, the Health Science Center's legal counsel, Jack Park, advised Dr. Hurd's counsel that Dr. Cigarroa felt uncomfortable passing judgment on this matter since he is not a breast surgeon. Consequently, Dr. Hurd was again denied her due process rights and continuation of the discriminatory treatment complained of herein.

39. Dr. Hurd, through her counsel, continued to press for a hearing. The UTHSCSA continued to deliberately stall and delay the process in an effort to deny Dr. Hurd a hearing. This resulted in further violations of Dr. Hurd's due process rights and the continuation of the discriminatory treatment complained of herein.

40. On November 24, 2008, UTHSCSA sent Dr. Hurd a letter (through her counsel) to the effect that the Health Science Center was no longer seeking Dr. Hurd's discharge from employment; however, Dr. Hurd would not be permitted to return to her clinical or surgical practice. It was only then that Dr. Hurd learned, for the first time, that her "suspension" and "reassignment" would be permanent.

41. The UTHSCA subsequently advised that, because it was no longer seeking Dr. Hurd's discharge, Dr. Hurd was not entitled to a hearing or to non-binding mediation under the Regents' Rules.

42. However, the practical effect of Defendants' action was to deprive Plaintiff of a meaningful name-clearing hearing and/or to "take Plaintiff's property interest" without due process of law. The actions of Defendant also continued the discriminatory animus/disparate treatment directed to Plaintiff.

43. Still Dr. Hurd pressed on for a hearing, both before the President and before the University of Texas Regents themselves. These requests have been denied in violation of Dr. Hurd's constitutional and civil rights.

**First Cause of Action: 42 U.S.C. Section 1981**

44. Hurd re-alleges and incorporates by reference Paragraphs 1 through 43 supra.

45. Plaintiff complains that she has treated in a disparate matter and race became a factor in her treatment. Plaintiff would show that she was qualified for the position that she held; that Defendant has taken an adverse action against her employment status and that others of different races have not been treated in such a hostile and inconsistent manner.

46. Plaintiff has seen her privileges revoked and her salary substantially reduced. Even when Plaintiff has met the standards imposed (review), Defendant have undertaken actions that have threatened Plaintiff's status with the institution as well as her compensation rate.

47. Even after Plaintiff met the procedures imposed, Defendant changed the rules, modified the rules and/or violated its own rules. Others in Plaintiff's status have not been treated in such an adverse and disparate manner. As a comparable, Dr. Peter Lopez, a trauma surgeon was recruited to the join the faculty in 2005. Upon information and belief, Lopez was unable to

8

obtain a medical license in Texas. The Board of Medical Examiners ruled that Lopez would not be granted a license unless matters pending in Florida was settled by the end of 2007 (Lopez had performed wrong-site surgery and there allegedly were two additional malpractice claims pending against him). Upon information and belief, when Lopez applied for his Texas License he failed to disclose his problems. When the matter came to the institution's attention the institution did nothing adverse against Lopez. In fact, Lopez would receive bonuses during his tenure with the University Defendant and his clinical expertise would not be challenged. The University has allowed Lopez privileges, allowed him to bill Medicaid, Medicare and insurance as a licensed Texas physician, even though he was not. Upon information and belief, Lopez left the institution in 2008 (voluntarily) because of the licensure issue in Texas.

48. However, others who are African American have been subject to discriminatory treatment in their conditions of employment (practice), including:

   A. Gena Gray, an African American trauma surgeon, had her training at UTHSCSA and was recruited to the faculty at the end of her training. Ultimately, Dr. Gray left UTHSCSA because she too was subjected to similar treatment and labeled incompetent because of clinical care;

   B. Francis Ford – first African American woman accepted into the surgical residency program suffered discrimination while at the institution. Dr. Ford was forced to file a formal grievance against Dr. Kahlenberg and Cohn and transferred to Duke University to complete an Opthalmalogy residency; Dr. Ford currently serves on the faculty at Duke.

   C. Melvin Pegram – an African American male who initially had trouble with low absite scores and was assigned two mentors to work with him for a year.

After mentoring, Pegram had the third highest ABSITE score for the year. Even after this Dr. Cohn took a position that he didn't care how high the score was, he wanted Pegram out of the residency program.

D. Os Blow, an African American attending was driven out by Cohn; race too was a factor.

### Second Cause of Action: 42 U.S.C. Section 1983
### Substantive and Procedural Due Process Rights

49. The individual Defendants have acted under the color of state law and such action were part of Defendant's practice (discriminatory and disparate practice), policy (not allowing name clearing hearing in circumstances where property interest have been taken), and custom (deprivation of hearing until termination is sought and changing rules and violation of rules in order to justify conduct).

50. Defendants' practice and policy has allowed it to deny Plaintiff a hearing on accusations directed against her even though the accusations essentially "take" Plaintiff's status and lower her compensation rate.

51. Defendants' actions have worked to deprive Plaintiff of her substantive and procedural due process rights.

### Third Cause of Action: Deprivation of Plaintiff's Property Interests in her Job

52. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 49 supra.

53. Plaintiff has a property interest in her job and in the benefits that her job bestows.

54. Plaintiff's property interest should not be taken without due process of law. The changing of procedures, denial of policies that are place has placed Plaintiff in a continual state of limbo.

## Conclusion and Prayer

55. Upon Final Judgment, Thelma Hurd prays that she be awarded the following:

   a. Reinstatement of her clinical and surgical privileges;

   b. Reinstatement of her salary to a level that it would have been but for Defendants' illegal actions;

   c. An injunction against Defendants from further violating Hurd's federal civil rights;

   d. Lost wages, lost retirement contributions, and lost research funds;

   e. Damages for emotional distress, humiliation, injury to reputation, inconvenience, and loss of enjoyment of life;

   f. Attorney fees;

   g. Costs of court; and

   h. All other equitable relief directed to the governmental entity (reinstatement of privileges and salary, declaratory judgment with respect to discriminatory treatment, non-retaliation) and other legal remedies to which she may be entitled.

Respectfully submitted,

GALO LAW FIRM, P.C.

Michael V. Galo, Jr.
Attorney-in-Charge
State Bar No. 00790734
4230 Gardendale, Bldg. 401
San Antonio, Texas 78229
Telephone -- 210.616.9800
Facsimile -- 210.616.9898

Anthony P. Griffin
A Griffin Lawyers
1115 Moody
Galveston, Texas 77550
409.763.0386
1.800.750.5034
Facsimile No. 409.763.4102

State Bar No. 08455300

ATTORNEYS FOR PLAINTIFF